FILED
IN CLERKS OFFICE

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

2025 APR 14  PM 4:29

U.S. DISTRICT COURT
DISTRICT OF MASS.

---

JANE SMITH,
*individually and derivatively on behalf of AI*
*Company (a pseudonym),*

              Plaintiff,

       v.

JOHN ROE (a pseudonym),
MASSACHUSETTS INSTITUTE OF
TECHNOLOGY,

              Defendants.

---

Civil Action No.:

JURY TRIAL DEMANDED

---

## COMPLAINT

Plaintiff Jane Smith, both individually and derivatively on behalf of AI Company[1] ("AI-Co"),

respectfully brings this action against Defendants John Roe[1] ("Roe") and Massachusetts Institute

of Technology ("MIT"), alleging the following:

## NATURE OF THE ACTION

1.   This action concerns the employment and business relationship between Defendant Roe,

     a research laboratory director at Defendant MIT, and Plaintiff, a former researcher and

     research director at MIT. They co-founded AI-Co, a software company. Plaintiff seeks

     damages for injuries related to her employment at MIT under the Massachusetts Wage

     Act, Title IX, the ADA, Mass. Gen. Laws ch. 1518, the whistleblower provisions of the

     SarbanesOxley Act and the Taxpayer First Act, and associated breach of contract and tort

---

[1] Plaintiff is filing with this Complaint a motion pursuant to Fed. R. Civ. P. 20 to join in this Civil Action a
second plaintiff who is the same individual as plaintiff John Doe (a pseudonym) in *Doe v. Massachusetts
Institute of Technology*, No. 1:23-cv-11490 (D. Mass.) and as plaintiff-appellant John Doe in First Circuit
Case No. 24-1888; and (b) a Motion to Proceed Under Pseudonym with respect to John Roe, the AI
Company, and, if joinder is allowed, John Doe.

claims. Additionally, Plaintiff brings derivative claims on behalf of AI-Co under Mass. Gen. Laws ch. 93A, §§ 2 and 11; Mass. Gen. Laws ch. 93, § 102; and related breach of contract and tort claims.

## PARTIES

2.  Defendant MIT, a non-profit corporation in Massachusetts, has over 11,000 employees and is located at 77 Massachusetts Avenue, Cambridge.

3.  AI-Co, a Delaware-incorporated for-profit LLC, was based in Cambridge, Massachusetts at all relevant times. Plaintiff brings claims on behalf of AI-Co derivatively.

4.  Defendant Roe, residing in Massachusetts or Vermont, is employed at MIT and is an AI-Co member.

5.  Plaintiff, a resident of Massachusetts at all relevant times relevant to this action (and later of California or Washington), was employed by MIT and is an AI-Co member.

## JURISDICTION AND VENUE

6.  The Court has subject matter jurisdiction per 28 U.S.C. § 1331 for claims under federal laws: Title IX (20 U.S.C. § 1681), ADA (42 U.S.C. §§ 12111-12117), and whistleblower laws of the Taxpayer First Act (26 U.S.C. § 7623(d)) and Sarbanes-Oxley Act (18 U.S.C. § 1514A(a)).

7.  Supplemental jurisdiction for state claims is pursuant to 28 U.S.C. § 1367.

8.  Proper venue exists under 28 U.S.C. § 1391(b) as MIT is headquartered in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### I. Plaintiff And Roe Collaborate In MIT Research And Entrepreneurship

9.  In 2016, Plaintiff, a Ph.D. scientist and entrepreneur, began working in an MIT laboratory supervised by Defendant Roe, who holds similar credentials and connections to MIT. They collaborated on developing artificial intelligence software, funded mainly by Department of Defense grants. After 18 months of successful collaboration, Plaintiff and Roe decided to establish a startup specializing in AI.

10. MIT's involvement in trade and commerce is significant, particularly in its startup ecosystem, where it converts laboratory research into commercial technologies. Through licensing intellectual property and resource allocation, MIT has contributed to the launch of over 2,800 startups, cumulatively raising $140 billion, creating 4.6 million jobs, and generating $1.9 trillion in revenue. This activity by MIT impacts commerce in Massachusetts and nationally.

11. Key figures in MIT's startup environment are laboratory leaders who blend science and business, regularly operating in a business context in the course of their work at MIT. A notable example is Professor Robert Langer's lab, which has launched over 40 companies valued at $23 billion. Langer's approach includes steering financing and licenses, using MIT's scientific publications and patents strategically, and liaising with venture capitalists.

12. Roe's lab, though less established than Langer's, has adopted a similar model of entrepreneurship. Since 2013, Roe has participated in the launch of five companies, two of which were acquired. Roe has actively engaged in their incubation, financing, and

operations, with the collective equity value of these ventures surpassing the lab's research funding. Roe's personal earnings from these activities have also, at times, exceeded his MIT salary.

13. MIT's engagement in science commercialization is governed by standards of ethics and fair play unique to a university setting. This includes adhering to conflict of interest policies, preventing private benefit as a tax-exempt nonprofit, and appropriately utilizing federal funds. As a recipient of federal grants and contracts, MIT bears heightened responsibility to prevent and address discrimination, protect whistleblowers, and maintain ethical standards, especially in the business-oriented activities of its employees.

### a. Plaintiff And Roe Launch A Profitable AI Company

14. In mid-2017, Plaintiff and Defendant Roe formed a joint venture, AI-Co, to commercialize AI software from Roe's MIT lab, incorporating it as a Limited Liability Company (LLC) in Delaware. Their oral operating agreement established equal ownership, governance by consensus, 50-50 profit sharing, and fiduciary duties to each other, which were later documented in written notes.

15. Both Plaintiff and Roe owed fiduciary duties of loyalty and care to each other and AI-Co under the default provisions of the Delaware LLC Act, and due to their roles as co-equal owners, member-managers, and de facto managers. They registered AI-Co in Massachusetts as a foreign corporation, listing themselves as managers and using Roe's home address as its principal business location.

16. In January 2018, Plaintiff dedicated herself full-time to AI-Co, while Roe balanced his role at MIT with part-time involvement in AI-Co. He complied with MIT's Conflict of

Interest (COi) policies, assuring Plaintiff that he had disclosed his AI-Co involvement to MIT and was authorized to allocate 20% of his time to the company.

17. AI-Co quickly secured contracts in various industries, with Plaintiff handling software development and Roe focusing on business development. By the end of its first year, AI-Co earned approximately $950,000 in revenue and $700,000 in profit, leading to distributions of approximately $450,000 to Roe and $300,000 to Plaintiff.

18. AI-Co distinguished itself as a woman-led and operated company in the male-dominated AI and high-technology startup sectors. Plaintiff, a woman, shared management with Roe, and the company's technical work for its onsite clients was exclusively done by women, including Plaintiff and two staff engineers.

19. The company's equity valuation in late 2019 was reasonably estimated to exceed $10 million, calculable from industry-standard revenue multipliers for the sector (AI) and by industry trends showing significant growth in the valuations of AI startups.

**b. Roe Persuades Plaintiff to Return to MIT to Establish a Research Center**

20. Starting in April 2019, Roe persuaded Plaintiff to reduce her role at Al-Co to rejoin MIT for establishing a new AI research center (the "AI Center"), asserting that this would enhance Al-Co's and her professional reputation. He convinced her by claiming to have secured $2 million for the AI Center and having MIT's authorization for this initiative, in discussions orally and in writing between April and July 2019, primarily in-person in Cambridge, Massachusetts and over their messaging applications.

21. In July 2019, Plaintiff agreed to return to MIT under specific terms, including co-founding the AI Center, engaging in certain research, publication activities and

lectures, and maintaining a directorial role, while dedicating 20% of her time to AI-Co. Roe committed to continuing AI-Co's business development.

22. Plaintiffs decision was influenced by Roe's assurances from May to July 2019 about the AI Center's potential benefits, despite the substantial salary cut and potential risks to AI-Co's equity valuation and financing prospects. Roe was aware of Plaintiff's reliance on his representations, as evidenced, for example, by a document from Roe's MIT staff that noted her reduced salary at MIT, about $150,000, compared to her industry rate, about $600,000.

## II. Plaintiff Discovers Concerning Working Conditions At MIT

### a. MIT And Roe Missclassify Plaintiff As A Non-Employee

23. From July 2019 to February 2020, Plaintiff effectively fulfilled her duties in Roe's MIT lab, securing two major research grants and receiving recognition for her strong performance.

24. Initially, Roe requested for Plaintiff to work under a contract while he finalized her employment status, a situation she accepted temporarily. From July 2019, Plaintiff worked under "Statements of Work" negotiated with Roe, which indicated her duties and expectations akin to those of an MIT employee, including working full-time under Roe's direction, in the usual course of business for MIT, and exclusively for MIT.

25. Despite being paid a fixed annual salary, the arrangement was structured around milestone-based payments, which Roe later instructed Plaintiff and his staff to align with regular monthly payments, thus ensuring Plaintiff a consistent monthly salary.

26. In her role at MIT, Plaintiff conducted scientific research and management tasks, working on these in MIT's normal course of business, and working under Roe's direction. She was required to be onsite and attend regular meetings like other employees, and she represented herself as an MIT employee, using an MIT job title and appearing as MIT personnel on research grants.

### b. Plaintiff Discloses A Disability To Roe

27. In October 2019, Plaintiff exhibited symptoms of Cushing's syndrome, a disorder potentially linked to a pituitary gland tumor, leading to diagnostic evaluations. By November 2019, medical assessments confirmed an impairment in Plaintiffs endocrine system, consistent with episodic Cushing's syndrome, and Plaintiff had developed a record of substantial limitations in major life activities, including working, concentrating, and sleeping, while in active illness.

28. In November 2019, Plaintiff disclosed her disability to Roe, explaining that a "neurological issue" had caused episodic exhaustion, concentration difficulties, and a slower work pace, necessitating adjustments during her diagnosis and treatment period. After this disclosure, Roe knew of Plaintiff's disability and regarded her as disabled.

### c. Plaintiff And Other MIT Employees Perceive Signs Of Sex and Gender Bias, Harassment, Or Discrimination In Roe's Lab

29. A 2018 report by the National Academies of Science and Medicine (NASEM) identified "gender harassment" as the most common form of sexual harassment in academia. The report defined gender harassment as verbal and nonverbal behaviors that communicate hostility, objectification, exclusion, or second-class status towards members, which could

be direct - targeted at an individual, or indirect - ambient in the environment. The report also highlighted that such harassment could create a hostile work environment, significantly altering employment conditions and impairing work performance, if severe and/or pervasive. Between September 2019 and February 2020, Plaintiff and other employees observed conduct in Roe's lab consistent with sex and gender harassment, discrimination, or bias.

30. For example, Roe recruited two women to his MIT lab who he had met on dating websites, after engaging in sexual or romantic relationships with them, then breached MIT's "Consensual Sexual or Romantic Relationships" Policy by supervising them without recusal or notifying the department head after the policy took effect in 2018, causing concerns among his staff about his fairness in hiring women, assigning them roles and titles, and terminating them.

31. In another example, Roe appeared to violate MIT's "Equal Opportunity/Affirmative Action and Serious Search" Policy by hiring predominantly male staff from his personal network, bypassing affirmative action protocols, thus limiting opportunities for women and other groups. Roe disregarded feedback from Plaintiff and others at MIT about his hiring practices' exclusionary effects. This perpetuated a sense of deliberate exclusion of women and other underrepresented groups.

32. Plaintiff, upon rejoining MIT in July 2019, experienced repeated exclusions from scientific activities in Roe's lab, consistent with a pattern of sex and gender bias. Examples include her exclusion from an all-male networking session close to her primary technical expertise, and Roe's infrequency in involving qualified women, including the

Plaintiff, in high-level meetings or discussions on creative and strategic matters, affecting her professional visibility and career development.

33. For example, Plaintiff, central to the AI Center's launch, was excluded from meetings about it attended by Roe and a male professor, despite her requests for inclusion. This pattern of exclusion extended to a conference led by Roe in 2018, discussed regularly 2019 and after, noted for its stark gender imbalance in organizers, keynotes, and scientific speakers. Due to discretionary personal invitations, this was perceived as intentional exclusion.

34. Some of Roe's decisions, such as excluding Plaintiff from speaking at an AI conference without explanation and assigning her administrative duties during a coworker's maternity leave, aligned with gender stereotypes and were not similarly imposed on male counterparts.

35. A graduate student in Roe's lab, known for derogatory comments about women and unchallenged by Roe, refused to collaborate with Plaintiff on a project around early 2020, after expressing doubt about her technical abilities. Plaintiff had the technical skills to do the project at hand. This student, under Roe's mentorship, did not co-author any of 15 publications from his entire graduate tenure with women co-authors, reflecting a pattern of academic collaboration where gender exclusion was tolerated - both by the student and Roe, his advisor.

36. In December 2019, at an MIT event, this student asked Plaintiff invasive, unwelcome, and personal questions about her sexual practices and berated her on the same subject, leading to a colleague intervening. Plaintiff ceased most of her interaction with him as a result, leading to reduced engagement by Plaintiff in her workplace.

### d. Roe's Association With Joichi Ito Contributed A Hostile Work Environment Based On Sex And Gender And Sex And Gender Harassment

37. In addition to direct interactions consistent with sex and gender harassment, discrimination, or bias in Roe's lab, Roe's association with Joichi Ito after Ito's resignation from MIT in September 2019 contributed to a hostile work environment indirectly, communicating exclusion, disregard, or reduced safety to women indirectly. Ito - the former director of MIT's Media Laboratory who resigned in September 2019 following reports that he had invited convicted Level 3 sex offender Jeffrey Epstein to MIT, solicited his funds, and concealed the project- was integrated by Roe into lab activities between October 2019 and 2023. This included meetings between Ito and Roe, Plaintiff's contributing to Ito-related projects, and Roe and others pursuing funding from Ito's venture capital firm, among other things.

38. Ito's direct interactions in Roe's lab were entirely or overwhelmingly limited to a small group of male scientists and engineers, furthering a sense of gender exclusion. This pattern was reinforced by Roe keeping certain contacts between Ito and the lab hidden from most researchers except a select group of male scientist and engineers.

39. The psychological impact of Ito's involvement in MIT activities contributed to a hostile environment based on sex and gender, as this impact was sex-and-gender-specific, given the gendered nature of Epstein's crimes and the gendered psychological response to Ito's presence.

40. In the weeks and months following September 2019, the wider MIT community, including hundreds of people, voiced their experiences of a credibly offensive and psychologicaHy harmful environment due to Ito's actions, particularly impacting women and survivors of sexual violence. These concerns were echoed in statements by MIT's

President and findings in an MIT report. Roe's disregard for these community sentiments, as well as the expressed discomfort of Plaintiff and a gender minority individual from his lab, sent a message of indifference toward the impact of Ito's presence on particular groups.

41. Contributing to a hostile environment based on gender, the psychological impact of Ito's involvement in MIT activities was gender-specific, given the gendered nature of Epstein's crimes and the gendered psychological response to Ito's presence. Furthermore, Roe's involvement with Ito after he resigned, with virtually no temporal gap, was unwelcome particularly for women and sexual violence survivors, contributing to a sense of broken safety and distrust by sending a message that MIT's institutional response to the Ito-Epstein events was 'just for show,' while behind the scenes, Ito's conduct involving Jeffrey Epstein at MIT was tacitly endorsed.

### e. Roe Takes Steps To Terminate His Executive Assistant, And Asks Plaintiff To Communicate Without Leaving A Record

42. Roe decided to terminate his Executive Assistant[2] (EA) after the EA had expressed concerns about potential sex-and-gender-based harassment, discrimination, or bias in the lab from about September 2019 to January 2020, including opposition to Roe's continued collaboration with Ito, which Roe was aware of.

43. Roe, contemplating the termination of his EA and seeking to avoid legal repercussions, disclosed his intentions to Plaintiff. Roe requested that their discussions be held through text files on a USB drive, rather than using recorded methods like Slack. Following Plaintiff's advice to consult with MIT officials and adhere to MIT's procedures, Roe

---

[2] This is the same individual as plaintiff John Doe (a pseudonym) in *Doe v. Massachusetts Institute of Technology*, No. 1:23-cv-11490 (D. Mass.).

initiated a "Performance Improvement Plan" for the EA shortly thereafter. This plan, however, appeared to be pretextual or a sham, due to Roe having decided to terminate EA in advance.

### f. Plaintiff Discovers Roe's Misrepresentations Regarding the AI Center

44. After accepting the position at MIT in 2019 to launch a new AI Center, Plaintiff informed her professional network that she would be taking on a directorial role there. However, by September 2020, Roe directed Plaintiff to refer to the initiative as a "project" instead of a "center" until it became official, and Roe later disclosed the need for an additional $20 million in fundraising for the center's launch.

45. In late January 2020, Roe admitted in a meeting with Plaintiff that he had not secured MIT's authorization to fundraise for the AI Center and that the $2 million donation, crucial to her decision to return to MIT, was not earmarked "for" the AI Center but was unrestricted funding. Despite these revelations, which Roe knew, or recklessly failed to confirm, by July 2020, Plaintiff agreed to continue working on the project with Roe given her significant existing investment and its potential benefits, albeit diminished from initial expectations.

### g. Plaintiff Discovers Research Conduct that Appears to Violate Federal Tax Law

46. In January 2020, Plaintiff received several documents (the "January 2020 Documents") from a departing colleague for project continuity purposes. Upon review over the subsequent weeks, Plaintiff developed concerns about potential violations of tax law, other laws and regulations, and MIT policies by Roe.

47. The January 2020 Documents revealed that since around 2017, Roe had solicited funds from a politically active donor for a project (the "Political Project") aimed at influencing the 2020 presidential election using AI from his lab. This included representations to the donor about directing MIT research toward partisan objectives, accepting funds, hiring former campaign operatives based on a partisan "hiring thesis", and providing engineering and unreleased MIT research to a registered Political Action Committee, among other activities. Based on documents and discussion, Ito appeared to have a coordinating role in this project.

48. Given MIT's status as a tax-exempt nonprofit under Section 50l(c)(3) of the Internal Revenue Code and its reporting requirements, Plaintiff reasonably believed that Roe's activities may have led to tax underpayment. Specifically, expenditures related to politics are not for exempt purposes for MIT, which would trigger excise taxes under 26 U.S. Code § 4955 as well as disclosure obligations, among other payments or penalties. The donations to MIT potentially related to this project, coming from the same donor, were about $4 million.

49. Furthermore, Roe's partisan political activities violated MIT's "Political Action" Policy (MIT P&Ps, 12.7) and threatened public trust in scientific research.

### h. Roe asks Plaintiff to Make a False Disclosure to a Research Sponsor, a Public Pharmaceutical Company

50. In early 2020, Plaintiff identified potential misrepresentations in a research project in Roe's lab, sponsored by Pharma-PublicCo[3], a public pharmaceutical company registered under the Securities Exchange Act of 1934. These misrepresentations could be material

---

[3] A fictitious name

to stakeholders like MIT, Pharma-PublicCo, and Pharma-PublicCO's shareholders, given the project's estimated commercial value of over hundreds of millions of dollars.

51. The U.S. pharmaceutical industry, including companies like Pharma-PublicCo, has a peculiar structure in which R&D - and the development of intellectual property - is largely outsourced to external entities, which do research on behalf of public pharmaceutical companies and share responsibility for accurate reporting and vigilance against fraud. Pharma-PublicCo's collaboration with MIT, as part of this industry trend, was included in reports prepared for the SEC and public from 2021 onward, alongside other SEC disclosures involving MIT licensing.

52. Between December 2019 and February 2020, Roe instructed Plaintiff to falsely disclose to Pharma-PublicCo that MIT's research would not form the basis for a future commercial venture. However, in January 2020, Plaintiff discovered plans on an MIT whiteboard indicating Roe's intention for commercializing the research, contradicting the disclosure.

53. Additionally, in late January 2020, Plaintiff uncovered another misrepresentation. Roe had instructed Plaintiff to inform Pharma-PublicCo that MIT must distribute software developed in Roe's lab as "open source" due to specific donor funding, despite knowing that donor's funds were unrestricted with no such obligations.

54. These contradictions suggested potential violations of 18 U.S.C. § 1343, considering Roe's misrepresentation, its role in Pharma-PublicCo's licensing negotiations with MIT, the project's large potential commercial value, the timing of the negotiations, Roe's undisclosed intent to commercialize, and Pharma-PublicCo's publicity campaign involving the MIT collaboration that was ongoing. The contradictions also suggested

possible violations of record-keeping requirements or internal controls involving the

disposition of Pharma-PublicCo's R&D intellectual property, as they would pertain to

potential diversion or compromise.

### III. Plaintiff Reports her Multiple Concerns to Roe in a Meeting

55. On February 12, 2020, Plaintiff met with Roe at MIT to discuss multiple serious concerns

about Roe's lab activities. Roe, as Principal Investigator and Plaintiff's supervisor, had

authority under MIT policies and procedures to address these issues.

56. Plaintiff reported Roe's involvement in the Political Project, suggesting it could violate

tax laws given MIT's 501(c)(3) status, involving possible underpayment. She highlighted

potential breaches of other laws, regulations, and MIT policies related to this project.

57. She addressed perceived misrepresentations to Pharma-PublicCo, urging Roe to correct

them and emphasizing the need to keep accurate records, as well as manage conflicts of

interest (COi) and private benefit in relation to the new venture outlined by Roe.

58. Plaintiff discussed her misclassification as a contractor for seven months, requesting

reclassification as an employee to correct payroll tax underpayments and indicating this

issue appeared to be widespread at MIT.

59. Critical to this reclassification was the necessity to accommodate her disability,

impairments related to Cushing's Syndrome, disclosed to Roe since November 2019.

Plaintiff emphasized that employee status was essential for accessing health benefits,

managing her condition, and ensuring eligibility for job-protected medical leave under

federal and state laws.

60. Reclassifying Plaintiff as an employee would not be an undue hardship for MIT, as it was a legal requirement under the Massachusetts Wage Act.

61. Plaintiff also expressed concerns about a potentially discriminatory and exclusionary environment in Roe's lab, particularly affecting women and survivors, citing specific instances and the involvement of Ito. She proposed solutions for fair scientific inclusion, including matters related to publications, mentoring, and participation in significant academic activities.

62. Roe acknowledged these concerns, leading Plaintiff to believe he would take corrective action.

### IV. After Plaintiff's Reporting to Roe, her Working Conditions Worsen

### a. Roe Takes Steps To Shorten Plaintiff's Job At MIT

63. Approximately four weeks following the February 2020 meeting, Roe initiated paperwork at MIT to limit Plaintiff's tenure in his lab to nine months. This imposed nine-month term, which was not part of the initial agreement between Plaintiff and Roe, was significantly less than the remaining periods of research grants Plaintiff led or co-led, with one grant having two years and another more than a year left, renewable. This would hinder Plaintiff from completing her ongoing research and diminish the value of her efforts at MIT.

64. Roe did not inform Plaintiff of the nine-month termination decision, which she later discovered.

65. An MIT administrator recalled that the decision to shorten Plaintiff's employment was what Roe, himself, wanted.

### b. Roe Does Not Properly Inform MIT Offices Of Plaintiff's Reasonable Accommodation Request

66. From March to October 2020, Plaintiff repeatedly informed Roe of her need for accommodation, specifically requesting proper employee classification, which was crucial for her rights under the FMLA[4], ADA[5], and COVID-related healthcare benefits, highlighting her personal health risks in general and during the pandemic.

67. Roe acted recklessly from February to July 2020 by failing to consult MIT offices for verifying Plaintifrs employee status; failing to communicate Plaintiff's reclassification and disability accommodation requests to MIT officials or include these requests in her employment documents; and deleting language about compliance with MIT's regulations on employment status from draft employment documents that Plaintiff had prepared.

68. Foreseeably, Roe's actions misled MIT administrators to treat Plaintifrs reclassification as a new hire rather than an urgent compliance issue for an existing MIT employee, causing an eight-month delay in Plaintiff's accommodation and reclassification requests, during a period when Plaintiff, due to her condition, was at increased risk and in need of health benefits, the delay exacerbated by MIT's hiring freeze amid the pandemic.

### c. Patterns Related to Sex-and-Gender-Based Exclusion or Bias Persist in Roe's Lab

69. From February to July 2020, Plaintiffs previously raised concerns about sex and gender harassment, discrimination or bias in Roe's lab persisted. Notable instances included:

   a.      In May 2020, after initially including Plaintiff in a research project for a publication, Roe removed her in June 2020 without explanation, replacing her with a

---

[4] Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601-2654
[5] Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101-12213

junior male researcher. A senior researcher reinstated Plaintiff in July 2020, acknowledging the exclusion and Roe's inadequate communication. This incident appeared to reflect a pattern, as similar removals from projects seemed rare for male colleagues at Plaintiffs seniority and more frequent for Plaintiff.

b.      Roe submitted a gender-imbalanced scientific reviewer list (90% men, 10% women) for a major AI conference in May 2020. Prepared by an all-male leadership team of five, the list perpetuated gender biases and diminished the professional visibility of Plaintiff and other women in the field, indicating a tolerance for extreme gender disparities. The list of scientific reviewers was discretionary and did reflect all possible candidates.

c.      In March 2020, Roe excluded Plaintiff from a project to use AI to detect gender and racial biases in organizations, despite Plaintiff being specifically qualified, having worked with human resources data in a recent project, and asking to be included. Ultimately, the team remaining on the project was an all-male team.

d.      Assigned to lead a COVID project around March 2020, Plaintiff faced unequal treatment from Roe compared with similar male-led projects: Roe reassigned key staff, failed to hire budgeted staff, and rarely attended project meetings, unlike other participating faculty across MIT. This hindered Plaintiffs leadership and professional credibility, who reduced team meetings due to the udnerstaffing, and it reflected the ambient pattern of bias.

e.      For the COVID project, Roe imposed excessive hiring hurdles, and extreme delays, for a well-qualified female scientist recommended by Plaintiff, deviating from

standard practices that Roe used for most comparable male staff and contradicting MIT's affirmative action policies. Roe persisted despite Plaintiff's repeated attempts to onboard the candidate.

f.      During the COVID project, Roe used gender stereotypes when Plaintiff's described her work as "operations" to the lab and external parties, while describing almost identical work done by a male colleague as applied research leadership. Roe also ceased using the title "executive" for her work, which he had done earlier, without reasonable explanation.

g.      In June 2020, Roe excluded Plaintiff, the lead of the COVID project, from a key meeting he organized with a prominent male faculty member, inviting a junior male researcher under Plaintiff instead, and failed to credit Plaintiff in presentation materials. Excluding her in this instance was a departure from normal practice due to her seniority and role.

h.      In the summer of 2020, Roe met with a woman Master's student so infrequently compared with her male counterparts that another woman, a Ph.D. student, described that she had endeavored to meeting with her so she would not feel sidelined.

i.      Roe terminated his Executive Assistant (EA), who had earlier raised gender discrimination concerns, in May 2020, in a manner perceived as humiliating and intimidating, which included derogatory comments shared with dozens of coworkers and implied mental health issues, a departure from normal process. In July 2020, implying retaliation, a staff member warned Plaintiff against raising concerns to Roe, citing the EA's treatment.

j.      Despite concerns about Joichi Ito's contribution to a hostile environment, Roe continued working with him on lab business in the period of February to July 2020, Roe including Plaintiff in certain tasks, showing indifference to the impact on women and gender minorities. As Ito's work with the Roe increased, Ito met with virtually only men from the lab.

k.      Similarly conveying a possible gender bias due to the departure from normal procedures, in an April 2020 press release about the lab's COVID project, Roe failed to acknowledge Plaintiff's leadership role, instead crediting only a male researcher and himself, which also undermined Plaintiffs professional recognition.

l.      Around July 2020, Roe drafted new Statements of Work (SOWs) that excluded Plaintiff from projects and publication opportunities, unlike arrangements for similar male colleagues. Despite negotiations, these SOWs reflected disregard for gender inclusivity and equal participation in scientific tasks.

m.      In March 2020, while Plaintiff participated in preparations for a conference as a Co-Chair, Roe regularly excluded Plaintiff from meetings and treated her with such secondclass status that another Co-Chair perceived her as an administrative assistant and asked her to re-book hotel rooms.

n.      Between this period and November 2020, Plaintiff remained classified as a contractor compared with two similar male scientists who were classified as employees.

### d. Plaintiff Discovers Conduct By Roe In A Business Context Appearing To Violate Duties To Plaintiff And MIT Policies

70. Around May 2020, Plaintiff discovered that plans existed since April 2019 to for Roe to dedicate 20% of his time to a new startup company, Graphics-NewCo, for a $60,000 annual compensation, which Roe had known about since at least July 2019, but Roe omitted these details during their April to July 2019 discussions regarding Plaintiffs MIT return, adversely to Plaintiff and AI-Co. Then he did indeed begin working 20% for Graphics-NewCo by around May 2020, inconsistently with working 20% for AI-Co..

71. Between February and June 2020, suggesting a pattern of violations, Roe appeared to breach policies related to COi and resource stewardship, including MIT's "Use of Institute Name" Policy (MIT Policies & Procedures, 12.3) and associated guidelines, by issuing a press release with a commercial entity, potentially misusing the MIT name and assigning MIT resources for that entity's benefit-actions that seemed to favor a relative of an MIT faculty member who had supported Roe professionally.

72. Similarly, in what appeared to contravene MIT's COi "Application of Guiding Principles" (4), Roe boasted of a "handshake agreement" with a student whose thesis he supervised to join Graphics-NewCo, a decision the graduate student ultimately did not follow through with, suggesting possible pressure and conflict in Roe's actions. This too indicated a knowing pattern of breaches in the business context in which Roe operated when he incubated startup companies, as this was contrary to a clear ethos at MIT to protect graduate students.

## V. Plaintiff Renews Her Reporting To Roe And MIT

### a. In July and September 2020, Plaintiff Sends Two Letters to Roe Reiterating and Renewing her Concerns

73. Plaintiff, troubled by ongoing employment misclassification and gender discrimination concerns, communicated these issues to Roe in letters dated July 23 and September 9, 2020, highlighting "potential retaliation" and inadequate response to disability accommodation requests made nine months prior. Upon information and belief, Roe promptly conveyed these letters to MIT's Office of General Counsel and/or Human Resources.

### b. After September 2020, Roe And Staff Treat Plaintiff Differently; The Political Project Continues

74. During Fall 2020, when the Phanna-PublicCo project's other lead took paternity leave, Roe bypassed Plaintiff, his co-lead, and appointed a male scientist to lead the technical meetings, without a valid explanation. This continued a pattern of exclusion.

75. In September 2020, Plaintiff was formally excluded from presenting work related to Phanna-PublicCo at a local conference, despite being project co-lead, while its other lead and newer male participant, personally invited by Roe, were included. Plaintiff was later added to the event following intervention by Roe's administrative staff with the conference organizers.

76. Starting in September 2020, Roe ceased direct communication with Plaintiff on Slack, a departure from their extensive messaging history since 2016. This was an extreme departure from the norms in the lab and their history.

77. Also in September 2020, Roe held their last one-on-one meetings, an essential component of their joint scientific research, concluding the next month's without explanation. Roe suggested future communications be in writing to both him and an administrative staff member. Roe reportedly continued normal meetings and messaging with other scientists and employees not sharing Plaintiff's concerns.

78. Around the same period, upon information and belief, Roe's staff invoiced MIT for about $100,000 of wages on Plaintiff's behalf, an invoice she refused to submit due to her contractor misclassification. The payment, sent to an outdated address and without notifying Plaintiff, remained unclaimed for years. Internal staff notes revealed hostility towards Plaintiff's concerns, labeled "creat[ing] a stink", and uncertainty about the legal implications of their actions.

79. Between mid-September and mid-October 2020, Plaintiff discovered that Roe's Political Project, which she had flagged in February 2020, was ongoing. By mid-September 2020, project involved a student and a foreign national scientist and included transferring valuable software, potentially breaching various laws, regulations, and policies.

80. Roe, in connection with the Political Project and the commercial venture with which he had issued a press release, had distributed software he labeled "open source," including labeling it as such to MIT's technology licensing office, for the benefit of select associates. This was contrary to his earlier practice of preventing privileged access for external entities, as he had done with AI-Co in 2018.

### c. MIT Finally Classifies Plaintiff As An Employee, And Demotes Her

81. On October 15, 2020, MIT proposed to officially classify Plaintiff as an employee, more than a year after she began working at MIT. This offer, occurring close in time after the

second of Plaintiff's letters to MIT on September 9, 2020, included at least nine adverse changes to the conditions of her work, which foreclosed her opportunities as a scientist and entrepreneur and harmed her reputation, and caused associated harms to AI-Co:

a.      Demotion: The offer removed the "director" title she has used since 2015, and that was an essential part of the negotiation around her return to MIT.

b.      Termination Timeline: It stipulated her termination in 9 months, before the end of her funded projects, and unlike similar scientists at her seniority working with Roe.

c.      Project Removal: She was removed from her most significant scientific projects, including with Pharma Public-Co, valuable work she co-led, for which she had been publicly recognized.

d.      Conference Ouster: She was barred from participating in a conference she co-organized, and for which she was the only woman scientific organizer, despite its preparations coinciding with her time at MIT.

e.      Grant Funding Restriction: Roe/MIT revoked her ability to seek grant funding, essential for a scientist's advancement and a privilege Roe extended to others.

f.      AI Project Limitation: All strategic, partnerships, and other high-level work related to the AI center (now termed the AI "project" due to Roe's misrepresentation) was removed.

g.      Exclusion from AI-Co: The offer excluded 20% time for work on AI-Co, prohibiting her from working at MIT while working on AI-Co, unlike what Roe was

entitled to do and had been entitled to do even while in the job role Plaintiff was offered. Plaintiffs query about Roe's similar arrangement was met without clear answers from MIT's attorney.

h.      No Keynotes: Giving keynote talks, as Plaintiff did in 2019, was removed.

i.      Medical Leave Eligibility: The offer's structure disqualified Plaintiff from FMLA or state medical leave eligibility, as MIT did not reclassify her past work with Roe as employment, thus failing to meet her request for reasonable accommodation. MIT's attorney countered that federal leave was unnecessary due to MIT's own medical leave policy.

82. In November 2020, Plaintiff learned that Roe had caused the defunding of her COVID project, by not informing her between about August and November 2020 of a funding deadline. Despite standard practices at MIT where lab leads utilize their allocated funding, Plaintiff learned that Roe's severe understaffing had resulted in the return of funds to the sponsor, who had relinquished the funding rather than hiring the qualified woman scientist that Plaintiff identified.

83. Plaintiff accepted MIT's employment offer in mid-November 2020. Acknowledging her ongoing research commitments, she chose to continue her employment to mitigate potential long-term harm to both her professional endeavors and AI-Co, aiming to transition her work effectively during this period.

84. Despite the adverse changes to her job, and other adverse conditions she was experiencing, by early 2021, Plaintiff was performing well on a research project with a corporate sponsor, an insurance company (the "Insurance Company"), and had received

positive feedback at MIT and the sponsor. Plaintiff also received positive feedback on her

work as a conference cochair, among other work.

### d. Plaintiff Files Two Administrative Complaints

85. In early 2021, Plaintiff timely filed two administrative complaints. The first, submitted to

the MCAD[6]/EEOC[7], addressed gender and disability discrimination. In it, she detailed her

experiences as a woman scientist at MIT since the 1990s, including two sexual assaults

and a nearly decade-long delay in publishing research, which in that instance had

suggested retaliation. The second complaint, filed with OSHA, raised issues related to tax

and corporate whistleblowing, as well as research and grant irregularities in Roe's lab.

86. After filing the MCAD/EEOC complaint in January 2021, Plaintiff informed a staff

member in Roe's lab. Both Roe and MIT were formally notified of the MCAD/EEOC

complaint by about March 2021, and of the OSHA complaint by about May 2021.

### e. The Adverse Consequences to Plaintiff Continue

87. Subsequent to filing these complaints and their acknowledgment by Roe and MIT, from

January 2021 to July 2021, Plaintiff faced numerous adverse actions during and after her

time in Roe's lab, which harmed Plaintiff as a scientist, enterpreneur, and person, and

diminished the prospects of her company AI-Co:

a.       Removal from Critical QueryTech Project: In January 2021, Plaintiff was

inappropriately removed from writing a research paper on the QueryTech[8] software

---

[6] Massachusetts Commission Against Discrimination
[7] United States Equal Employment Opportunity Commission
[8] A fictitious name

project by Roe, or accessing its software or contributing to it in any other way, despite her significant contributions over 1.5 years, including code testing, grant leadership, and involvement in publication plans, which was the core of her work at MIT. This removal flouted years of Plaintiff's undersatndings with Roe and others, and was critical to her ability to advance as a scientist and operate as an entrepreneur, reputationally and practically.

b.       Removal from Publication. Plaintiff was removed from publication opportunities from the Pharma-PublicCo research, despite her contributions to date meriting them.

c.       Notice of Non-Renewal: In February 2021, Roe, in a meeting with HR, informed Plaintiff of the non-renewal of her position post-June 2021, irrespective of performance or funding. In the same meeting, as reflected in notes, Roe shared that he had ended all his meetings with Plaintiff due to her legal consultations, something Plaintiff pointed to as unambiguous retaliation to the HR staff person present, who denied that it was and did not appear to investigate.

d.       Interference in Scientific Publication: Plaintiff's MCAD complaint, highlighting nearly a decade-long delay in publishing a research paper and subsequent removal of her expected authorship, was not adequately addressed by MIT, which diverted the issue to a research misconduct process instead of addressing the discrimination claim.

e.       Disclosure of Complaint: In or around April 2021, MIT violated confidentiality by disclosing Plaintifl's discrimination complaint within her lab, undennining her professional environment.

f.      Obstructed Rehire Opportunities: In May 2021, despite the Insurance Company's wish to continue collaborating with Plaintiff, MIT created insurmountable barriers to her rehire, which were upon information and belief coordinated with the participation of MIT's attorney and HR staff.

g.      Withdrawal of Transition Support: A professor's initial offer to assist Plaintiff's transition within MIT was retracted post-disclosure of her administrative complaints, leading to the project's end. Upon information and belief, the professor did not know of Plaintiff's administrative complaints when he agreed to assist her, and knew about them when he ceased communications with her.

h.      Exclusion from Collaboration: Roe had initiated a research collaboration in early 2021 closely aligned with Plaintiff's expertise but excluded her, assigning an all-male team.

i.      Denial of Support for Publication: Roe refused to support Plaintiff's efforts to rewrite and submit a conference paper to a journal related to the project with Insurance Company for specious reasons.

j.      Speaking Engagement Cancellation: A corporate research sponsor's speaking invitation in July 2021 was canceled due to MIT blocking Plaintiff's research efforts. This opportunity was particularly valuable due to Plaintiff's due to the sponsor's interest, otherwise, in continuing to engage with her professionally.

k.      Delayed Publication Achievement and Unpaid Work: Resolving an issue raised in her MCAD complaint, a research publication that Plaintiff successfully completed in

March 2023 working with a student and ombudsperson, Plaintiff faced more than a year of costly delays caused by MIT or that MIT did not remedy.

l.      MIT Press Coverage Refusal: MIT declined, without explanation, to report on the same article through MIT News press office or the department's news office, deviating from the unmistakable norms for similar publications, while such press coverage had conveyed a large benefit to similar scientists in the past, improving their reputations and chances for professional advancement.

m.      Invasion of Privacy: In connection with the same publication process and alleged retaliation, Plaintiff learned that her doctoral thesis advisor had distributed personal records and photos without her knowledge, whose discovery was significantly delayed due to MIT's inaction. Furthermore, once Plaintiff learned of this, the humiliation impeded her work related to the subject matter.

### f. Roe Unfairly Competes with AI-Co, Ensuring It Cannot Operate

88. By February 2021, MIT, including vicariously through Roe's acts in the course of his MIT duties and largely in Massachusetts, incubated a new startup company or joint venture, QueryTech-NewCo, which used the QueryTech software from MIT, and directly rivaled AI-Co. Far exceeding the bounds of fair, ethical, and lawful competition, Roe utilized his position at MIT to take a number of anticompetitive actions that would put AI-Co out of business in favor of a preferred group of entrepreneurs, including at least two MIT scientists he employed until 2021, by doing, inter alia, the following:

a.      IP Licensing Not At Arms Length And For Less Than Fair Market Value: Roe

selectively allowed commercial access to QueryTech, which is MIT intellecutal property,

from June 2021 to March 2023, to a select group of entrepreneurs he favored, benefiting

QueryTechNewCo and Ito's venture capital firm in a business context, without making

licensing deals at arms length nor for fair market value as required by MIT's policies and

related laws and regulations. Upon information and belief, QueryTech-NewCo's

commercially exclusive access to QueryTech was obtained virtually for free, and because

QueryTech-NewCo is the successor to software used by AI-Co that is so far inferior that

AI-Co could not possibly compete, and is specialized enough to have no substitutes, this

effectively prevented AI-Co from operationg.

b.      Misrepresentations to Evade Internal Controls: Upon information and belief, Roe

used misrepresentations between about 2021 and 2023 to evade MIT's internal controls

on software distribution and licensing, for example by describing software as "open

source" to members of MIT's offices related to licensing, while knowing QueryTech's

source code was not actually revealed to the public and would not be while it was being

exploited commercially, which upon information and belief, Roe did repeatedly to confer

private benefit to select associates, not just for QueryTech-NewCo but for example in the

Political Project;

c.      Delayed Open Source Release As Part Of An Open Early, Closed Late Scheme:

MIT delayed the open-source release of QueryTech, contradicting previous assurances to

both Plaintiff and funders, in what has been similarly characterized as an anticompetitive

"Open Early, Closed Late" scheme in university licensing at a similar institution;

d.      Distorted Scientific Publication To Favor Commercial Venture: MIT's scientific publication of QueryTech research in 2022 excluded Plaintiff and instead involved collaboration with Ito's venture capital firm, through one of the venture's former-MIT entrepreneurs. This constituted a "Failure to Deal" that was anticompetitive for at least two reasons. First, it contravened previous agreements with Plaintiff and scientific norms about fair participation in publication activities, including equitable participation for women and whistleblowers. Second, it wrongfully used MIT's monopoly in one market (an "innovation market" or "R&D market" for research in a highly specialized novel software technology) to provide a head-start monopoly in a different product or service market in which the QueryTech-NewCo venture operated.

e.      Misuse Of Confidential Information. Upon information and belief, Roe used confidential MIT information in the process of helping QueryTech-NewCo or its principals obtain business financing, including but not limited to the characteristics of the unpublished software itself;

f.      Protected Class Discrimination and Retaliation: Roe's failure to deal with Plaintiff and AI-Co, and other acts co exclude them from engaging in the same way as competitors, was done with discriminatory and retaliatory animus, particularly favoring all-male teams and environments unwelcoming to women as part of a long pattern, and retaliating as part of a long pattern of acts driven by similar animus;

g.      Defamation. Roe removed mentions of AI-Co and Plaintiff's directorship from his MIT website, and removed Plaintiff's characterization as a director, which were of and

concerning AI-Co and Plaintiff in those contexts, with a tendency to create a false and harful impression, between about 2020 and the present.

h.      Failures to train and supervise. MIT's lack of oversight and supervision, its tacit approval of discriminatory and retaliatory acts, its lack of open source software oversight processes that are reasonably designed to prevent diversion, and other acts by MIT, enabled or caused the other types of anticompetitive conduct by Roe.

### g. MIT Acted With Reckless Indifference To Roe's Misconduct

89. MIT fostered a culture where lab leader misconduct faced no consequences, undennining any effective response to violations, a culture in which Roe's wrongful conduct toward Plaintiff and his anticompetitive acts were foreseeable.

90. Despite sufficient grounds from Plaintiffs complaints to prompt investigations under various legal obligations (e.g., Title IX, federal contracts), and individuals like MIT's OGC attorney who were positioned to act knowing of these details, MIT neither investigated properly nor protected Plaintiff from reprisals. For example, by September 2021, MIT's OGC attorney knew that Plaintiff had sent Roe a letter expressing concerns about retaliation, was aware that the changes to Plaintiff's job lined up with multiple examples of possible retaliation enumerated in MIT's "Non-Retaliation" Policy, and knew that Plaintiff had engaged in protected activity by sending Roe certain letters about one month earlier, and still did not investigate or take steps to remedy retaliation. Thus, MIT could and should have stopped Roe's wrongful acts occurring after about September 2021, or earlier, and did not.

91. Systemically, MIT's policies increased risks for whistleblowers, lacking transition funding, applying a flawed "professor is always right" standard, failing to utilize checklists for detecting retaliation, and improperly routing complaints.

92. Enabling Anticompetitive Conduct: MIT's policies, particularly regarding open source software and conflict of interest (COi), were inconsistently applied, favoring certain entrepreneurs, and failed to address the dynamics between modern research and startups.

## VI. Damage To Plaintiff And To AI-Co

93. Actions by Roe and MIT obstructed Plaintiff's scientific and entrepreneurial career, damaging, inter a/ia, Plaintiff in her wages, reputation, and advancement opportunities as a scientist and software developer in the valuable field of Al, as well AI-Co in its reputation, expectancies, and access to crucial resources like QueryTech, with damages equal to the total obstruction of the business from operating.

94. After decades of devoted service to MIT and good faith attempts to raise legitimate concerns internally, Plaintiff was betrayed by her long-term institution stood by and watched as Roe derailed her prospects. MIT's and Roe's conduct harmed Plaintiff in ways that were emotional and physical as well as professional. For example, one of these impacts was the exacerbation and growth of a large pituitary tumor that Plaintiff ultimately discovered was causing her endocrine symptoms after she left MIT, with an elevated recurrence probability due to its then-large size, which would require lifelong vigilance.

## VII. Plaintiff's Standing To Bring A Derivative Action

95. Because Plaintiff and Roe jointly and co-equally own AI-Co, both parties' consent is required to initiate an action on AI-Co's behalf. A demand on Roe to initiate such an action would have been futile due to his status as a defendant and his employment with MIT, another defendant. Therefore, no demand was made by Plaintiff.

96. Under AI-Co's LLC Operating Agreement, Plaintiff is a member, has been a member throughout the acts and omissions giving rise to this action, and anticipates maintaining this membership until the action's conclusion.

## COUNT ONE

## Massachusetts Wage Act (M.G.L. c. 149)- Failure to Timely Pay Wages (Against MIT)

97. The preceding allegations are incorporated herein by reference.

98. At all relevant times, Plaintiff was an employee of MIT.

99. MIT failed to pay wages earned by the Plaintiff within the required time frame.

100.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT TWO

## Massachusetts Wage Act (M.G.L. c. 149)-Misclassification (Against MIT)

101.    The preceding allegations are incorporated herein by reference.

102.    At all relevant times, Plaintiff was an employee of MIT.

103.    At all relevant times, MIT classified Plaintiff as a non-employee.

34

104.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT THREE

### Massachusetts Wage Act (M.G.L. c. 149) - Retaliation (Against MIT)

105.    The preceding allegations are incorporated herein by reference.

106.    At all relevant times, Plaintiff was an employee of MIT.

107.    At all relevant times, Plaintiff engaged in protected activity under the Massachusetts

Wage Act.

108.    MIT subjected Plaintiff to adverse actions, including employment actions, as a result

of Plaintiff's engagement in the protected activity.

109.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT FOUR

## Handicap Discrimination (M.G.L c. 151B, § 4) - Failure to Accommodate (Against MIT and Roe)

110.    The preceding allegations are incorporated herein by reference.

111.    At all relevant times, Plaintiff was an employee of MIT.

112.    At all relevant times, Plaintiff was a qualified handicapped individual.

113.    At all relevant times, Plaintiff requested a reasonable accommodate for her handicap.

114.    At all relevant times, MIT did not provide the requested accommodation.

115.    Failure to accommodate Plaintiff was a type of unlawful discriminatory practice.

116.    Roe was acting within the scope of his employment and MIT is liable for Roe's conduct.

117.    At all relevant times, Defendants' conduct was outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others.

118.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT FIVE

### Sex Discrimination in Violation of Mass. Gen. Laws. ch. 151B (Against MIT and Roe)

119.    The preceding allegations are incorporated herein by reference.

120.    At all relevant times, Plaintiff was an employee of MIT.

121.    Defendants engaged in unlawful discriminatory practices against Plaintiff based on sex and gender and continues to do so.

122.    Defendants' conduct was outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others.

123.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT SIX

### Hostile Work Environment Sex and Gender Harassment in Violation of Mass. Gen. Laws. ch. 151B (Against MIT and Roe)

124.    The preceding allegations are incorporated herein by reference.

125.    Plaintiff, a woman, is a member of a protected class.

126.    At all relevant times, Plaintiff was an employee of MIT.

127.    Plaintiff was subjected to unwelcome verbal or physical conduct related to their sex and gender.

128.    The employer, MIT, knew or should have known about the harassment and failed to take prompt and effective remedial action.

129.    The conduct was sufficiently severe or pervasive to alter the conditions of the Plaintiffs employment and to create an intimidating, hostile, or offensive work environment.

130.    Roe was acting within the scope of his employment and MIT is liable for Roe's conduct.

131.    Defendants' conduct was outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others.

132.    Plaintiff suffered damages as a result of Defendants' actions.


## COUNT SEVEN

## Discrimination in Violation of Mass. Gen. Laws. ch. 151B (Against MIT and Roe)

133.    The preceding allegations are incorporated herein by reference.

134.    At all relevant times, Plaintiff was an employee of MIT.

135.    Plaintiff, a woman, is a member of a protected class.

136.    Defendants engaged in unlawful discriminatory practices against Plaintiff based on sex and gender and continues to do so.

137.    The employer, MIT, knew or should have known about the discrimination and failed to take prompt and effective remedial action.

138.    Roe was acting within the scope of his employment and MIT is liable for Roe's conduct.

139.    Defendants' conduct was outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others.

140.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT EIGHT

### Retaliation in Violation of Mass. Gen. Laws. ch. 151B (Against MIT and Roe)

141.    The preceding allegations are incorporated herein by reference.

142.    At all relevant times, Plaintiff was an employee of MIT.

143.    At all relevant times, Plaintiff engaged in protected activity under Mass. Gen. Laws. ch. 151B.

144.    Defendants subjected Plaintiff to adverse actions, including employment actions, as a result of Plaintiff's engagement in the protected activity.

145.    Defendants' conduct was outrageous, egregious, evil in motive, or undertaken with reckless indifference to the rights of others.

146.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT NINE

### Deliberate Indifference to Discrimination in Violation of Title IX (Against MIT)

147.    The preceding allegations are incorporated herein by reference.

148.    At all relevant times, MIT was an educational institution that receives federal funding in support of its educational programs.

149.    At all relevant times, Plaintiff was attempting to participate in MIT's educational programs.

150.    Plaintiff, a woman, is a member of a protected class.

151.    Plaintiff experienced sex and gender discrimination at MIT.

152.    Defendant acted with reckless indifference to the occurrence of sex and gender discrimination.

153.    The employer, MIT, knew or should have known about the discrimination atainst Plaintiff and failed to take prompt and effective remedial action.

154.    Plaintiff suffered damages as a result of Defendant's actions.


**COUNT TEN**

**Deliberate Indifference to Hostile Work Environment in Violation of Title IX
(Against MIT)**

155.    The preceding allegations are incorporated herein by reference.

156.    At all relevant times, MIT was an educational institution that receives federal funding in support of its educational programs.

157.    At all relevant times, Plaintiff was attempting to participate in MIT's educational programs.

158.    Plaintiff, a woman, is a member of a protected class.

159.    Plaintiff experienced a hostile work environment on the basis of sex and gender harassment at MIT while attempting to participate in its educational programs.

160.    Defendant acted with reckless indifference to the occurrence of a hostile work environment.

161.    Plaintiff suffered damages as a result of Defendant's actions.

## COUNT ELEVEN

### Deliberate Indifference to Retaliation in Violation of Title IX (Against MIT)

162.    The preceding allegations are incorporated herein by reference.

163.    Plaintiff experienced a hostile work environment on the basis of sex and gender harassment at MIT while attempting to participate in its educational programs.

164.    At all relevant times, Plaintiff engaged in protected activity under Title IX.

165.    Plaintiff was subjected to adverse actions as a result of Plaintiff's engagement in the protected activity.

166.    Defendant acted with reckless indifference to the occurrence of such retaliation.

167.    Plaintiff suffered damages as a result of Defendant's actions.


## COUNT TWELVE

### Retaliation in Violation of Title IX (Against MIT)

168.    The preceding allegations are incorporated herein by reference.

169.    Plaintiff experienced a hostile work environment on the basis of sex and gender harassment at MIT while attempting to participate in its educational programs.

170.    At all relevant times, Plaintiff engaged in protected activity under Title IX.

171.    MIT subjected to adverse actions as a result of Plaintiff's engagement in the protected activity.

172.    Plaintiff suffered damages as a result of Defendant's actions.

## COUNT THIRTEEN

### Failure to Accommodate in Violation of The ADA (Against MIT)

173.    The preceding allegations are incorporated herein by reference.

174.    At all relevant times, Plaintiff was an employee of MIT.

175.    At all relevant times, Plaintiff was a qualified disabled individual.

176.    At all relevant times, Plaintiff requested a reasonable accommodate for her disability.

177.    At all relevant times, MIT did not provide the requested accommodation.

178.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT FOURTEEN

### Retaliation in Violation of The ADA (Against MIT)

179.    The preceding allegations are incorporated herein by reference.

180.    At all relevant times, Plaintiff was an employee of MIT.

181.    At all relevant times, Plaintiff engaged in protected activity under the ADA.

182.    Plaintiff was subjected by Defendant and Roe to adverse actions as a result of Plaintiff's engagement in the protected activity.

183.    Roe was acting within the scope of his employment and MIT is liable for Roe's conduct.

184.    Plaintiff suffered damages as a result of Defendants' actions.

## COUNT FIFTEEN

### (Derivative Claim for Breach of Fiduciary Duty by Defendant Roe)

191.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

192.    Plaintiff brings this action derivatively on behalf of the AI-Co.

193.    Defendant Roe owed the AI-Co a fiduciary duty in their capacity as member, manager and 50% shareholder of the AI-Co.

194.    Defendant Roe breached that fiduciary duty by engaging in conflicted roles, selfdealing, interfering in prospective advantageous business relationships, and/or failing to act in the best interest of the AI-Co.

195.    As a result of Defendant Roe's breach of fiduciary duty, the AI-Co has suffered damages, including but not limited to lost profits, harm to its reputation, and potential legal liabilities.

196.    Plaintiff has standing to bring this derivative action because they are a member, manager, and 50% shareholder of the AI-Co and has been so throughout the relevant time period.

197.    Plaintiff has taken appropriate steps to demand that the Defendant Roe address the breach of fiduciary duty, but those attempts have failed and Plaintiff has determined that such attempts are futile due to Defendant Roe's conflicts of interest, necessitating this derivative action.


## COUNT SIXTEEN

### (Derivative Claim for Violation of ch. 93A by MIT)

198.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

199.    Plaintiff brings this action derivatively on behalf of the AI-Co.

200.    At all relevant times, MIT and AI-Co both operated in trade and commerce in a business context.

201.    At all relevant times, MIT and Roe engaged in an acts or practices that were unfair or deceptive, in Massachusetts.

202.    AI-Co Plaintiff suffered damages as a result of Defendant's actions.

## DEMAND FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests the following relief from this Court:

A.    Enter judgment in favor of Plaintiff and against Defendants Roe and MIT for all causes of action stated herein;

B.    Award compensatory damages to Plaintiff for lost business opportunities, lost profits, and other monetary losses attributable to Defendants' wrongful acts, and the same to AI-Co derivatively;

C.    Grant Plaintiff damages for emotional distress and any related physical ailment as permitted by law;

D.    If warranted by the evidence, award Plaintiff punitive and exemplary damages in accordance with statutory guidelines, and the same to AI-Co derivatively;

E.    Allow for the recovery of prejudgment and post-judgment interest on the monetary awards as provided by law, and the same to AI-Co derivatively;

F.    Award Plaintiff the costs of this suit, including reasonable attorneys' fees, as may be recoverable, and the same to AI-Co derivatively;

G.    Order an accounting by Defendant Roe of any profits or benefits accrued due to the alleged fiduciary breaches and mandate restitution to AI-Co of the same;

H.    Impose a constructive trust on any property or assets wrongfully held by Defendant Roe that equitably belong to AI-Co;

I.    Enjoin Defendants, preliminarily and permanently, from engaging in further activities that violate Plaintiffs rights;

J.    Require Defendant MIT to adopt and enforce comprehensive internal reforms to rectify the practices that contributed to the alleged violations and to prevent their recurrence;

K.    Provide such other and equitable relief as the Court deems just and proper under the circumstances.

Respectfully submitted,

Dated: April 14, 2025

*s/Jane Smith*

Jane Smith

(617) 826-9435

411 Walnut Street #21341

Green Cove Springs, FL 32043-3443

23cv11935jcb@proton.me

## VERIFICATION

I, Jane Smith, under the pains and penalties of perjury, hereby depose and say that I am the Plaintiff in the above captioned action and that I have read the allegations in the foregoing Verified Complaint and, as to each statement of fact alleged therein, I hereby affirm and verify that I have actual knowledge of each such fact and that such fact is true, except as to matters specifically alleged on information and belief, which I believe to be true.

Signed under the pains and penalties of perjury on this 14th day of April, 2025.

Dated: April 14, 2025

**s/Jane Smith**

Jane Smith

(617) 826-9435

411 Walnut Street #21341

Green Cove Springs, FL 32043-3443

23cv11935jcb@proton.me